Case No. 20-1277, et al. Ameren Illinois Company doing business as Ameren Illinois et al. Petitioners v. Federal Energy Regulatory Commission. Time for the petitioners. Ms. Chu for the respondent. Good morning, Mr. Saitlin. Proceed when you're ready. Good morning. Misha Saitlin for Ameren. I'd like to reserve three minutes for rebuttal. For over 10 years, Ameren spent millions of dollars on transmission materials and cost. These are things like schools of wire, poles, things of that sort. It is undisputed that that category of materials is recoverable under the Federal Power Act and under FERC policy. Because, of course, those expenditures are necessary so that customers get reliable energy transmitted through the transmission line. Now, Ameren, during this period, following standard industry practice, reported all of those costs and materials on Line 8 of Page 227 of Form 1. Of course, that made a lot of sense because that is the only line that identifies functionalization of transmission costs. Then in 2018, FERC changed how it wanted the form filled out, said that all those costs that are construction need to be put on Line 5 only. Now, we have no particular problem with putting those costs where FERC wants them now going forward, even though that makes the form kind of a mess. You know, it's their form. We're happy to do it. But the problem is that then they ordered 10 years of retroactive refunds for expenditures that are unquestionably prudent, recoverable under the Federal Power Act, and FERC policy. Now, in our brief, we talked about multiple independent reasons why this court should vacate the orders on review. But as we pointed out in our reply brief, the most straightforward way for this court to dispose of this case is apply this court's decisions in Code Gateway, China Concord, Gulf Power, and say that FERC entirely failed to exercise its discretion in determining whether, in good conscience and equity, there should be refunds here. Now, again, the legal test that this court has laid out in those cases articulated for retroactive refunds, which is an equitable remedy in the nature of disgorgement, is in good conscience and in equity. Can the utility keep that money? Would the utility get some sort of windfall? Can I ask you about the windfall? Yes. That seems like it's a key idea in all of these cases. So on one level, it seems your position has a lot of force. This seems hyper-technical. We're talking about lines on a form. And so there's no windfall relative to what might be thought a just and reasonable rate under the statute. That's right. But in the context of the filed rate doctrine, why shouldn't we think of windfall as windfall meaning something above and beyond the filed rate? And by that measure, there is a windfall because your tariff didn't cover line five. The nature of an equitable inquiry is you look beyond form and you look at substance. This court certainly found an error in Koch-Gateway. That was an error. And this court made clear in Koch-Gateway and those other cases that a finding of an error, which, by the way, we dispute that we made an error, but a finding of an error is the beginning of the inquiry. It is not the end of the inquiry. In fact, there was an argument in Town of Concord where FERC was on the other side. The towns there were arguing FERC's got to give a retracted refund automatically. It has no statute and FERC has no discretion. And FERC argued forcefully, no, we have discretion. There's no automatic refunds. We need to do an equitable analysis. Well, they won that argument, and they can't run away from it now. They have discretion, and they have to look into the substance. Were these recoverable costs as a matter of the Federal Power Act and FERC policy? Yes, that's undisputed here. Okay, but where that argument seems to point to is that the violation of a filed rate won't produce a refund if the amount is just and reasonable under the statute. I think that as a general matter, correct, but there could be automatic. Maybe, but that's a pretty broad principle. It seems like the default rule is in the run-of-the-mind case, if you have a violation of filed rate doctrine, you'd get a refund. I mean, that's certainly not what Town of Concord said. I think that was kind of the core submission of the towns in Town of Concord, that it was just like that. And FERC argued forcefully the other way. It said it's the beginning of the inquiry. You've got to have an error. I mean, retroactive refunds, this is discouragement. It's a big deal. You're clawing money back. So the way that this court's case law articulates it out of respect is not like that. It's that there has to be an equitable analysis. But you don't have a huge number of cases where there's a violation but no refund. You have Koch. You have Gulf, Concord. And, Your Honor, I think this case is on all fours with Koch and with Gulf Power. And, you know, we made a big deal out of Koch in our opening brief. I didn't even see my friends at FERC in their response brief or the interveners. Are you going to come to distinguish that case? And I think that case is enough. But I will say that there could be other considerations beyond fair, just, and reasonable that could be taken into account in equitable balance. So what can you give me besides there is a violation of the filed rate doctrine, but there is nothing that would make this unjust or unreasonable under the statute? What else in your case distinguishes your case? I think if there was some sort of real carelessness by the utility, the utility was doing something very different from what everyone else was doing. It was a really unreasonable reading of the form. If there was some sort of allegation that they were doing is trying to hide the ball in some way to avoid an audit. But here we're doing like normal things. Twenty other MISO transmission lines were doing it. All these big other utilities were doing it. This was, I think, the best reading of the form, but at least it was a very reasonable one. How would we distinguish? Were we to hold that FERC failed to appropriately exercise its equitable discretion? How do we distinguish the Duke decision? Because it seems like this is really on all fours with the analysis there. Well, Duke Energy Progress was obviously the decision that started this problem. The issue there was that Duke Energy Progress never even petitioned for reconsideration or came to this court because they came to a negotiated resolution with their municipal customers. So the fact that Duke made a separate piece, and I don't know what the economics were, or this relationship were, certainly can't be held against us to cause us to have to give up $11 million of prudently expended materials and costs. Prudently expended, but I take the commission's position to be prudently expended in part on construction. And as you well know, construction is a very different kind of expenditure from operations and maintenance. And so the fact that there's a line there, I mean, the physical ambiguity of the chart is only part of the picture. If you're operating a business in which construction is typically dealt with quite differently from operations and maintenance, that alone seems to me to be quite a practical guide in reading and filling out a form like that. I mean, I don't think there's anything in the record here to suggest that the difference between construction and maintenance in the transmission realm is more meaningful than the difference between production, transmission, and distribution. In fact, what do you need to buy in order to do a construction project? It's the same kind of schools of cable poles that you need to do an expansion. If you have a storm that knocks out a portion of your line, you're going to need to rebuild that line. That can be seen in construction. That can be seen as maintenance. But for rate purposes and for understanding a filed rate, isn't it quite different when there's a discussion of sort of what are the expenses of plants in service and what are the expenses of construction? And that's why there's similar materials. But if they're being used quite differently, then one thing can be an annual transmission requirement and the other is building up capital. Well, I think in doing the equitable analysis, and this is in the nature of discourse, I think that regardless of where one thinks of those as very different, it has to be if there was a finding by FERC that because we didn't report this correctly, there wasn't an audit that couldn't have been done and they would have disallowed some of those expenses. Yeah, sure. We could have a different inquiry. But here they relied on what I would term some sort of perverse form of per se disgorgement. And there's no equitable principle that allows that. They really got to look at the substance. And I think there's two levels. One, are these as a category the kinds of materials and supplies that can be recovered? Undisputed that they are. Once used for construction? Sorry, Your Honor? Once used for construction as opposed to operation and maintenance? The way that it works, Your Honor, and you can find this at JA356, which is them approving this going forward. And I'm just going to quote this directly. They said in approving this going forward that these were just reasonable and consistent with commission precedent that allows materials and supplies assigned to construction to be included in the rate base prior to being assigned to specific construction projects and then transferred to accounts that are capitalized. This is a foreign book for policy and applies in the same way those prior 10 years going forward. Sorry, this is a foreign book and maybe dumb question. But is there some basic rate making principle that would treat construction and maintenance costs differently? I would think maintenance costs are more likely to be just expensed in the current period. And construction costs, you have to capitalize them. I mean, yes. I mean, there's certainly a way that it's done. That is how FERC does it. Right. But there's no suggestion here that there was a different. I guess I hadn't thought of this, but Judge Pillard's question takes on greater importance the more there's just this basic distinction within rate making between construction and maintenance. And maintenance is more favorable. Classifying something as maintenance is more favorable to the utility as you recover the costs immediately rather than over time. I apologize. There is absolutely nothing in this record that would support that kind of distinction, that it would be more favorable. This were obviously on an APA review. That's why I asked you about how rate making works. I think it works differently for different utilities. But I would say that if your honors are concerned about that, if you all want to send it back to FERC for some limited review about whether it would have been $10 million rather than $11 million, if we had classified it the other way, that wouldn't be a problem for us. We think it would cash out the same way. And I did want to talk about why our reading of the form was more reasonable, but I see I'm in my rebuttal time. Let me just ask you, Mr. Snell, line five costs were not part of the filed rate until the rate was amended in, was it, 2020? That's right, your honor. They weren't part of the file. They were not part of it because we were reporting this the way that industry was in a standard manner reporting this, and I think a very reasonable interpretation of the form. And I think the other interpretation is just, frankly, unreasonable. And I don't want to eat up all my rebuttal time, but I would ask your honors to not overlook our argument that we really think that we made no error, that we think that Order 200 gave us the choice to do it our way or FERC's way. And FERC's argument that the way that they're wanting us to do it now under Duke Energy Progress is the only way is just contrary to what Order 200 said, which is that those filling out the form have the choice on the method of functionalization. That's the key word in Order 200, that we have the choice on the method. Thank you. We'll give you a little bit of rebuttal time. Good morning, Ms. Chu. Good morning, your honor. Good morning. May it please the court. Order 200 did not give utilities the choice to lump together all of their material for both construction and operations and maintenance. Your honors are correct that there is a distinction. Going back to 1982, the commission made clear that utilities need to report this information, that it was important for the commission to have the estimates of which amount of their materials are going to construction and which are going to their general everyday operations and maintenance. If the materials and supplies had been properly reported on line five, there's no risk that the utility would not ultimately be reimbursed in some way for its construction. Costs are there. Well, going not under the rate, but under some capitalization. I think, your honor, that this portion, if this allowed under their filed rate, would not be recovered. You know, it was not recoverable under Ameren's filed rate at the times that are relevant for this case. Now, going forward, Ameren, of course, has revised its. And the commission had no problem with that. That's correct, your honor. The commission had no problem with that. But with respect to the prior period, the commission followed its general refund policy, which has been expressed in many cases. It's been expressed in the consolidated Edison case, which we cited in the orders, in the brief, in the towns of Concord case and in the commission precedent, Puget Sound. So the commission has this general refund policy that where there is a violation of the filed rate, as there was here, the commission grants full refunds. And that's because the commission, excuse me, the utility here misreported these amounts. And so the commission did do, I understand, Judge Katsas, you were asking if, well, you know, isn't this, this may appear to be somewhat hyper technical. But, you know, I think it's not. As your honors were both pointing out, there are implications for rate making. Let me. Can you just explain that to me? I had thought the purpose of this form was just to help the commission gather information for its planning purposes. The utilities objected that this was unclear, it'll be hard to characterize. And you said, yeah, that's right. But it still might be helpful to us. So do your best and we'll give you discretion. And that, to me, feels very different from the suggestion we had in the course of your friend's argument, that there is this very basic distinction between construction and maintenance. And it would have made all the difference in the world as to how those costs are treated, capitalized or not, depending on which line they are put under. So which of those is more accurate way of looking at things? Right. Let me try to explain, your honor. Thank you for the question. You're correct that form one is, this page of form one is informational, but it's not just for the commission. And the commission pointed out in the refund of rehearing order that this is part of a formal challenge. This case comes up as a formal challenge by a customer to a utility's annual update. And the formal challenge process, it's pretty iterative. As you may have noticed in the joint appendix, there are just pages and pages of inputs to the formula, just pages and pages of numbers. And so there's a lot of back and forth actually between the utility and the customer before the case comes to the commission. And there can be disputes as to what amounts are appropriately folded into the filed rate. So the information on page 227 is not just for the commission, it's also for the customer. And that's where the commission is making clear that the utility is on the burden. This is like a section 205 filing as the commission, as this court has found actually. The formal challenge is somewhat similar to a section 205 filing. That's the Northern Virginia case.  And in Ameren's brief, they refer to many other utilities who have following Duke Energy, submitted amendments. And they suggest that many other utilities have completed form one with a zero on line five. And so should we anticipate many cases from other utilities in a similar situation who are dealing with a similar overcharge? I don't think so, Your Honor. I think those, I'm not aware of any cases that are, you know, exactly on all fours with this. Like, you know, I'm not entirely sure, but I don't expect the court should anticipate a whole slew of cases along these lines. But I also want to point out that the commission made clear in the rehearing order that predecessor affiliates of Ameren were aware of this reporting requirement. So this goes into the balancing of the equities. Ameren knew, you know, as of, you know, going back to 1982, Ameren knew that the commission wanted it to break out construction materials from materials that are used in maintenance. And let me give you the citation for the predecessor companies. That's at the rehearing order, paragraph 29, note 64, JA 727-28. How common is it, Ms. Chu, that a line rather than an account is treated differently under a formula rate? Your Honor, I'm not sure. It's true for accounting purposes. My understanding is that it's, for accounting purposes, it's, you know, there's no particular importance because all of these lines, they're in account 154 for materials and supplies. But that said, you know, again, this is going back to the Duke Energy case, paragraph 22, which says that there are rate making implications for where you report these lines. And your honors are right that generally construction materials are, they eventually are capitalized. And the rate making, specifically on the question of lines five versus six within account 154. Right. Both of those lines are in account 154. No, I understand. But there is a rate making consequence on that. Right. Well, I mean, as you can see here, your honor, I mean, this formula rate did not fold in line five. So there was a rate consequence. The formula rate draws from certain inputs from the FERC form one. Where can we see that in the record? That the formula rate, I mean, the closest I get is in, I guess because it's JA 832. But I wonder if it just, you know, I am envisioning a formula. And I'm envisioning a box, you know, a variable that's got a line reference and, you know, that it's plugged in. I mean, it's certainly the way both parties have briefed it and it has a bit of that feeling. But I haven't actually been able to see something that corresponds to that understanding. Oh, well, your honor, that was it, JA 832. It's a little hard to see, but it's line 27 where it says materials and supplies. And in the second column, it says 227.8.C and .16.C, which indicates that the input is page 227, lines 8C and line 16C. Line 16 is not at issue here. How about line 5? I mean, for example, plant and service above, in the middle of that very same page, has net plant and service. And it refers to transmission. And it seems to encompass lines 2 to line 8. There's a bunch of bracketed line series that would include line 5. To be honest, your honor, I'm not sure what that is referring to because this page, JA 832, in this second column, these pages, these are different pages in FERC form 1. So you can see there's page 205, 207, 219. I'm not sure whether the net plant and service, I'm not sure which lines those are referring to. But I will say that the materials and supplies that we're talking about here, line 27 and column 2, that's what Ameren revised. Ameren revised that portion to add in 227.5 as an input. So going forward, line 5 costs are folded in. But going backward, FERC felt there was a violation of the formula rate here. And this is a formal challenge context where the utility is obligated to show its work. And here the customers had overpaid to the tune of $11 million. And the commission felt that it was equitable to follow its general refund policy and order full refunds. Judge Rogers, do you have questions? If I do, I'll speak up. All right, great. Thank you. Thank you, Your Honors. Thank you, Your Honors. I think I can clear up this issue that you were asking about, Judge Katsas. There would have been absolutely, absolutely no rate implication from changing it from construction to maintenance. You can see it on the line that counsel just mentioned. The clearest way to look at it is on J9. I'm sorry, to the J832? Yes. Well, J9 I think is clear because it's in red line. I'm sorry, where? J9 is clear because it's in red line. Okay. Okay. So it's the very last line there. 27? That's right. So you see the C, 5C is added there? Right. That's right. So it's calculated the same way. The math works out exactly the same. It's because the recovery here is for carrying costs, for keeping it in the warehouse, for buying it in advance. So the carrying cost to keep in the warehouse maintenance-related schools and towers is the same. So in other words, FERC allowed you going forward not simply to recover line 5 in the abstract, but to put line 5 into, I'll just call it line 27 of your formula rate, and line 27 is treated however it's treated, but it picks up 5 and 6. That's exactly right. And this is why this is the most trivial of ministerial errors, if there was an error, and we strongly dispute there was. FERC wouldn't have done anything differently. None of the customers would have done anything differently. This is, again, unless this court is prepared to overrule Coke and Gulf, ministerial errors cannot lead to retroactive refunds, which are in the nature of a discouragement. This court's case law holds it over and over again, and no attempt to distinguish Coke, and for those reasons, I would ask your honors to vacate the orders on review. Thank you. The case is submitted.
judges: Pillard, Katsas, Rogers